# IN THE COURT OF APPEALS FOR THE STATE OF MISSISSIPPI

## NO. 2024-KA-00794-COA

**DARQUISE JAMES DAVIS**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                    **APPELLEE**

DATE OF JUDGMENT:                06/21/2024
TRIAL JUDGE:                     HON. CALEB E. MAY
COURT FROM WHICH APPEALED:       SCOTT COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:               STEVEN SIMEON KILGORE
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION                      AFFIRMED - 02/17/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     A Scott County Circuit Court jury found Darquise James Davis guilty of capital murder for killing Christe'ian Benford during a robbery in violation of Mississippi Code Annotated section 97-3-19(2) (Rev. 2020).  The court sentenced Davis to life imprisonment in the custody of the Mississippi Department of Corrections without eligibility for parole. On appeal, Davis argues that the evidence presented was insufficient to support the capital murder conviction and that the verdict was against the overwhelming weight of the evidence. Having considered the record, the arguments of counsel, and relevant precedent, we affirm Davis's conviction and sentence.

## Facts

¶2.    Around 7:30 p.m., on April 1, 2022, Benford and his brother, Micah, met at a hangout spot in Morton called the "Block," the site of a torn-down apartment building. The slab from the building was used as a basketball court. Benford, who had been selling drugs for several months, was in his older model blue car, counting money (about $3,000 or $4,000). A little while later, Benford said he was going to the gas station. Micah said he would meet him back there at the Block later, and the two parted.

¶3.    Earlier that day, Calvin Luckett and his friend Willie "Scoop" LeFlore had been hanging out at the Block as well. Two others joined them, "Pete" (whose last name is not in the record) and Lavondrick Sylvester ("Von"). They all saw Davis riding in a gray Toyota pickup truck, and Scoop pointed him out to Luckett and told him that Davis was known as "Prada." Later, Luckett overheard a call that Scoop got from Davis. Davis said that "he had a motion with an old school blue car," which meant that Davis was recruiting Scoop to join him in robbing someone in an older model blue car.

¶4.    Luckett left the Block around 6 or 6:30 p.m., caught a ride to pick up his mother's car, and ultimately returned to the Block around 7:50 p.m. Luckett saw the old blue car with Benford sitting inside. Luckett parked his car near the street, got out, and went to the basketball court. Luckett testified that three men walked up to him with guns; two wore masks, and the one who did not was "Von." They told Luckett to turn and walk to Benford's car with his hands up. Luckett and Von walked to the passenger side of Benford's car, while the other two, armed with a rifle and a handgun, went to the driver's side. Luckett heard

2

them fire three shots, and one bullet went through the passenger side door and hit Luckett in the shin. Luckett, who was able to get to his car, saw the gray Toyota pickup truck drive up to Benford's vehicle. The driver yelled to the others, "Come on Von, Prada, and B.D." Luckett could not identify who was driving the truck, but he was clear about the names the driver called. Instead of going with the others in the truck, Von chose to drive Luckett to the hospital in Luckett's car. Before they left the scene, Luckett looked back and saw the passenger side door had been left open, although he had not opened it.

¶5.     Meanwhile, when Benford did not show at the gas station, Micah went home for a while and then returned to the Block. There, he found Benford in the driver's seat of his vehicle, leaning over to the right and bleeding from four gunshot wounds. Recalling that he had passed police officers on his way back to the Block, Micah found them, and they returned with him to the site of the shooting. Officer Willie Anderson observed Benford's wounds (in his neck and right hand). After other officers arrived, Anderson left to respond to a call from the hospital that a shooting victim was being treated. Thinking the two incidents may be related, Anderson went to the hospital and interviewed Luckett. Meanwhile, officers searched Benford's vehicle and found a red backpack containing illegal drugs and two guns but no cash.

¶6.     Later that night, around midnight, Officer Darren Sollek of the Pearl Police Department saw a Toyota truck without a license plate at a local gas station. The driver, whose pants were sagging, revealing his red underwear, appeared to be nervous when he saw the officer. The driver pumped only $4 of gas and left the station at a high rate of speed and

3

with no lights on. Sollek followed, and the Toyota's speed increased. Sollek clocked it at 95 miles per hour in a 45-mph zone. Sollek activated his blue lights and took chase, during which the truck reached speeds of 115 to 120 mph. When they reached Whitfield Hospital, the truck entered the hospital grounds, going 60 mph. At one point, the truck failed to negotiate a curve, went airborne, and landed in a ditch. The passenger and driver exited and fled, eventually splitting up. Sollek radioed for backup assistance, and the passenger, Jordan Meyers, was apprehended. The driver, Davis, was also found hiding in the water in the ditch. Sollek identified him as the driver by Davis's red underwear.

¶7. Officer Sollek searched Davis's truck and found a 9-millimeter handgun on the passenger floorboard and an assault rifle.

**Procedural History**

¶8. On November 28, 2023, a Scott County grand jury indicted Davis, Meyers, Luckett, and Von for one count of capital murder, charging them with killing an individual during a robbery, violating Mississippi Code Annotated section 97-3-19(2)(e).[1] Davis moved to sever his case from his co-defendants, which the court granted. Luckett and Von reached plea agreements with the State; Luckett pled guilty to the lesser offense of armed robbery, and

---

[1] Section 97-3-19(2)(e) provides in part:

The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

. . . .

(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . .

4

Von pled guilty to manslaughter. In exchange for his plea, Luckett agreed to testify against Davis.

*Trial Testimony*

¶9. During the trial, held on June 10-11, 2024, the State called nine witnesses, including the State Medical Examiner, law enforcement officers, a forensics expert, the pathologist who conducted the autopsy, Micah, and Luckett.

*Micah*

¶10. Micah testified to the facts noted above. He added that Davis, whom he knew as Prada, had sometimes hung out with Benford. Micah testified about the exchange that Davis and Benford had on the phone about two days before the shooting concerning Davis's alleged theft of a gun from Benford's cousin. Several people were discussing the issue when Benford said he would get Davis on the phone. In the call, Benford accused Davis of stealing the handgun and he told Davis that he needed to bring the gun back.[2] Micah also told the jury that Benford had been dealing drugs and had between $3,000 and $4,000 on him that night. Micah identified photos taken at the crime scene, including some depicting the wounds on his brother's body.

*Officer Anderson*

¶11. Officer Anderson testified to his twenty years of experience in law enforcement. He

---

[2] Before testimony began, the court considered Davis's motion in limine to exclude this testimony. However, the court ruled that the testimony of both Benford's accusation of Davis and Benford's dealing drugs was admissible under MRE 404(b) for the limited purpose of showing motive, and that under MRE 403, the testimony was more probative than prejudicial.

confirmed that on the night in question, while he was on patrol, Micah approached him and Officer Jack McGee and told them that his brother had been shot. Both he and McGee followed Micah to the Block in their cars. Anderson described finding Benford's body and identified several crime scene photos that were entered into evidence, showing the location, the car, and the body. Anderson further testified that when he went to the hospital, he interviewed Luckett and determined him to be a person of interest in Benford's shooting.

¶12. The Mississippi Bureau of Investigation assisted because there were several suspects over several different jurisdictions. Anderson testified that on the morning after the shooting, April 2, 2022, he and MBI Agent Jerome Moore went back to the crime scene and retrieved several AK-47 (a 7.62mm rifle) fired rounds and a 9mm fired round as well. They also went to the garage where Benford's vehicle had been towed and inspected it as well. The back windows were up, but the front windows were partially down. None were broken. They observed a gaping hole in the passenger side back door that looked like a gunshot had gone through. Through trajectory rods placed in the holes, they determined where the shooters had probably been standing. Photos of the vehicle and the fired rounds at the scene were entered into evidence.

*Luckett*

¶13. Luckett testified that he had pleaded guilty to robbery in this case. He recounted what happened as stated in the facts above. He also said that only two people planned the robbery, but he did not know who. Luckett also stated that he knew "of" a person nicknamed "Prada," but he did not know Prada personally. He stated he saw Prada earlier on April 1, 2022,

6

driving a silver pickup truck. When he got back to the Block later that evening when the robbery and shooting occurred, Luckett said he and Von were on the passenger side of Benford's car. When the pickup came to get the others after the shooting, Luckett said he did not know who was driving, but that person called for Von, B.D., and Prada. Since Von was with him, Luckett said that one of the two shooters on the driver's side then had to be Prada. But the two shooters had masks on. Luckett also testified that after he got to his car to leave, he looked back and saw that someone had opened the passenger door on Benford's car.

*Officer Sollek*

¶14.    Sollek, a Pearl Police Department officer with over twenty years of law enforcement experience, testified to the facts above, including his encounter with Davis at the gas station, the high speed chase that ensued, and Davis's arrest. Sollek also identified the rifle and handgun that he found in Davis's truck, and both were entered into evidence.

*Kimberly Turner*

¶15.    Turner, the evidence officer at the Pearl Police Department, testified to transporting the two guns Sollek seized to the Mississippi Forensics Laboratory (Crime Lab) for forensics testing.

*Marcus McDougle*

¶16.    McDougle testified that he was an investigator with the Morton Police Department. He has worked in law enforcement for twenty-five years— eleven as an investigator. He was assigned to this case and went to the scene on the night of the shooting. When he arrived,

7

several people were at the scene, including people in the neighborhood. However, officers secured the area to keep it intact for investigative purposes. McDougle observed Benford's wounds, searched the vehicle, and found a spent gunshot round near the back floorboard on the passenger side. He identified the shell casing, and it was entered into evidence. He and other officers also found a significant amount of illegal narcotics and two handguns in a red backpack on the front passenger seat. However, they found no cash.

¶17. McDougle also found a shell casing outside the vehicle on the driver's side in the grassy area by the concrete slab and one on the passenger side of the car as well. It was near the hole in the door where a shot had gone through. McDougle stated that officers remained on the scene until 4:00 a.m. the next morning, and that the chief stayed all night to secure it until Officer Anderson and Investigator Moore with the MBI arrived to finish processing the scene.

¶18. McDougle further testified that he, along with Investigator Moore, interviewed Luckett at least two times. Luckett said that Prada came up with the plan to commit the robbery. McDougle also said that Luckett identified Davis as Prada from a photo he was shown. On cross-examination, McDougle confirmed that they interviewed Luckett several times due to the effects of the medication from his treatment for his gunshot wound before Luckett became more consistent with his facts.

*Jerome Moore*

¶19. Investigator Jerome Moore with the Mississippi Department of Public Safety testified that he collected three 7.62x39mm shell casings at the site and placed each in a separate

8

evidence box, which were entered into evidence. He also identified and entered a 9mm shell casing that he retrieved from the scene. Using photographs of the scene, he showed the jury where the casings were found. Moore testified that he took these casings and others the Morton police had found to the crime lab. The Pearl police had taken the two guns from the vehicle involved in the chase that night to the crime lab as well. Moore said he asked the crime lab to compare the guns with the shell casings. Moore also testified to his interviews with Luckett, during which he had shown Luckett a photograph of Davis, and Luckett told him that Davis went by the street name Prada. Luckett also said that Jordan Myers had been riding with Davis earlier in the evening.

¶20. Moore also interviewed Davis. Davis's written waiver of his *Miranda* rights[3] was entered into evidence, and Moore reviewed the rights listed in the waiver for the jury. Moore then told the jury that at first, Davis told Moore that he had no nicknames and that he had been at "June's" house in Newton County at the time of the shooting. But when Davis could not give June's last name or address, and when Moore told him he knew that Davis went by "Prada" and that people had placed him in Morton, Davis abandoned his alibi. Davis admitted that he was known as Prada and that the 9mm gun was his handgun, but the rifle was not his. Davis also said that he owned the Toyota Tundra.

*Starks Hathcock*

¶21. The State next called Starks Hathcock, a forensic scientist at the Mississippi Forensics Laboratory, specializing in firearms identification. He explained that he analyzes physical

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

evidence, including firearms, bullets, and cartridge casings to determine if those components were shot from a particular firearm. His background included a bachelor's degree in criminal justice from the University of Mississippi and two years of apprentice-type training at the crime lab. He was trained at the FBI academy in Quantico on firearms identification. He also worked at the Georgia Bureau of Investigation's firearms laboratory. He had been with the Mississippi Forensics Laboratory for over twenty-nine years and had been accepted as an expert about 300 times.

¶22. The State tendered Hathcock as an expert in the field of firearms examination and comparison. The defense questioned Hathcock concerning his qualifications and the methods Hathcock used. As an example, Hathcock explained that if a projectile is shot from a certain gun, markings from the barrel of the firearm will leave markings on the softer bullet casing. He therefore test-fires guns at least twice and microscopically compares the resulting projectiles and casings side by side with the projectiles and casings collected by law enforcement. The defense objected to Hathcock's designation, and the jury was excused while the court questioned Hathcock further.

¶23. Hathcock explained that his methodology was used worldwide, and the results have been routinely relied upon by courts. He reported the findings of the tests he did in this case. After questioning by the court, neither the State nor the defense had any further questions. The court overruled the defense's objection to Hathcock's designation as an expert and allowed him to testify to the jury.

¶24. Hathcock told the jury what he had told the court concerning his forensics process,

10

including the test-fires from the guns and the comparison of the casings to those found at the scene. He used this procedure to compare the casings and guns in this case. He told the jury that shell casings do not go down the barrel, but they are affected by an area of the gun called the "breech" or "breech face." He explained that when the breech face is manufactured, it is milled and sanded, and "all that" leaves markings as well. So, Hathcock explained, when the casing comes out, it slams into the breech face, which impresses its marking on the casing.

¶25. Hathcock testified that he examined the casings and guns submitted to him, which were a Canik 9mm handgun and a SKS 7.62mm rifle. He concluded that three of the casings submitted to him were not fired from the guns that were submitted.[4] The results of two other bullets were inconclusive because although there were characteristics consistent with the rifle, including similar grooves to the SKS rifle provided, the casings were too mutilated for him to say definitively that they were fired from this firearm. Mutilation can occur if the projectile hits something hard, like a car door. But Hathcock testified that the 9mm casing, in his expert opinion, was "for sure" fired from the 9mm gun submitted. Hathcock's report on his findings was entered into evidence. On cross-examination, Hathcock agreed that he could not tell *when* someone fired the 9mm gun and shot the bullet that matched the shell casing. However, he saw no rust on it that would indicate that it had been a long time since it was fired, nor did he note any weathering or damage to the casing, such as damage from being run over.

---

[4] One casing provided was a .40-caliber S&W casing and could not have been fired from either the handgun or the rifle provided to him.

*Dr. Frank Peretti*

¶26.    The State called Dr. Frank Peretti to testify by Zoom from North Little Rick, Arkansas. Peretti retired from the "National State Crime Lab" three years ago and since then has helped perform autopsies for the Mississippi Medical Examiner's Office.[5] He has performed over 15,000 autopsies and testified in court, including Mississippi courts, as an expert in forensic science. The court accepted Dr. Peretti as an expert with no objection from the defense.

¶27.    Peretti explained the general steps of an autopsy, which is performed to determine the manner and cause of death. In this case, he performed an autopsy on Benford and determined that Benford died of four gunshot wounds, and that the manner of death was homicide, which is medically defined as the killing of one person by another. Peretti identified photographs taken during the autopsy and reviewed those that showed Benford's wounds, including those to his neck, his left arm, another just below his Adam's apple, and on his right hand just below the thumb. Peretti also described the trajectory of some of the bullets that would have caused these wounds. All came from the driver's side of the vehicle, either from slightly behind the driver's door or slightly in front. Peretti also determined from the absence of soot or stippling around the wounds that the shots were fired more than two feet away. Peretti could not determine the size or caliber of the bullet that would have caused

---

[5] Dr. Peretti's experience with state medical examiner's offices dated back to 1985, when he interned at the Rhode Island medical examiner. He then worked as chief medical examiner in Baltimore, Maryland, where he completed his specialty training in forensic pathology. He also worked in Arkansas for twenty-eight years as the associate medical examiner of Arkansas.

the wounds.

*Verdict*

¶28.   When the State rested, Davis moved for a directed verdict, which the court denied. Davis elected not to testify and presented no witnesses in his defense.  After conferring with the parties on the jury instructions, the court instructed the jury not only on capital murder, but on a lesser-included offense of first-degree murder.  After hearing the parties' closing arguments, the jury deliberated and returned a verdict of guilty of capital murder.

*Sentencing*

¶29.   On June 13, 2024, the court held a sentencing hearing after having received a pre-sentencing investigative report from the Mississippi Department of Corrections.  Neither the State nor the Defendant had any proposed changes or amendments to it.  Davis did not make any statement and no one representing the victim addressed the court either.  The court reviewed the statute concerning capital murder as well as the parole eligibility statute that would make Davis ineligible for parole.  The court proceeded to sentence Davis to life imprisonment without parole.

*Motion for New Trial*

¶30.   On June 21, 2024, Davis filed a motion for a new trial, arguing that the verdict was against the overwhelming weight of the evidence and that the court erred in refusing the peremptory instruction for the jury to find defendant not guilty.  Davis also argued, generally, that the court erred in refusing his other proposed instructions, but he did not name any specific instruction refused.  Davis further argued that the court erred in its rulings on the

parties' evidentiary objections without identifying any specific ruling the court made in error. Finally, Davis argued that the court erred in allowing the crime lab expert to give his opinion on the bullet casings' comparison to the guns in evidence, but Davis provided no authority to support his claims. The court denied the motion for a new trial on June 26, 2024. On July 10, 2024, Davis appealed.

¶31. On appeal, Davis raises only two issues: whether the evidence presented was insufficient to support his conviction and whether the verdict is against the overwhelming weight of the evidence.

**Standard of Review**

¶32. "We review a challenge to the sufficiency of the evidence de novo." *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). "When reviewing a ruling on the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Schlegel v. State*, 303 So. 3d 30, 46-47 (¶59) (Miss. Ct. App. 2020). Viewing the evidence in the light most favorable to the State, we must decide if rational jurors could have found the State proved each element of the crime beyond a reasonable doubt. *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017).

¶33. "Challenges to the weight of the evidence are reviewed under an abuse of discretion standard" after a trial court denies a motion for a new trial. *Simmons v. State*, 387 So. 3d 1036, 1043 (¶24) (Miss. Ct. App. 2024). In such a challenge, we view the evidence in the

14

light most favorable to the verdict, and the jury's verdict will be overturned "only when it is so contrary to the evidence presented that to let it stand would sanction an unconscionable injustice." *Hawkins v. State*, 410 So. 3d 462,468 (¶19) (Miss. 2025).

**Discussion**

### I. Whether the evidence presented was insufficient to support a jury's conviction of capital murder.

¶34. As noted above, to decide if the State's evidence was sufficient, we review the evidence de novo to determine whether a rational juror could have found that the State proved each element of the crime charged beyond a reasonable doubt. *Jones v. State*, 354 So. 3d 384, 392-93 (¶28) (Miss. Ct. App. 2023). Here, Davis was charged with capital murder, which under section 97-3-19(2)(e) is defined as "[T]he killing of a human being without the authority of law. . . by any person engaged in the commission of the crime of . . . robbery. . . ." The State did not need to prove all the elements of murder, but "only that the killing took place while the accused was engaged in the commission of the enumerated felon[y]." *Id.* at 393 (¶29) (quotation marks omitted) (citing *Booker v. State*, 303 So. 3d 1133, 1138 (¶18) (Miss. Ct. App. 2020)).

¶35. However, the State did have to present sufficient proof of each element of the underlying crime of robbery. *See id.* Robbery is defined in Mississippi Code Annotated section 97-3-73 (Rev. 2020) as follows:

> Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

15

Mississippi Code Annotated section 97-3-79 (Rev. 2020) defines armed robbery as follows:

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

Thus, "in Mississippi both an attempt to take and an actual taking of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Clark v. State*, 343 So. 3d 943, 999 (¶270) (Miss. 2022).

¶36. In this case, Davis does not challenge the fact that Benford was killed, but he argues that the State's evidence of the robbery was insufficient.

¶37. First, Davis claims that the proof offered of the plan for the robbery was speculative because Luckett only testified to his "understanding" of what Davis meant when he said he had a "motion on an old school blue car." Davis cites *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974), to state that a "conviction in criminal cases must rest upon finite evidence and not probabilities or surmise." This general principle, however, should be understood in the context of *Sisk*'s facts. There, the defendant was charged with embezzling machinery from the county, and the State's evidence consisted of invoices for parts that the State claimed did not fit any county machinery. *Id.* at 473-74. However, in reversing Sisk's conviction, the Mississippi Supreme Court noted that there was no evidence that the parts were ever attached to Sisk's own machinery and the evidence also showed that the invoices appeared "suggestive, we think, of clerical error in the shipment of parts unsuitable for the county's machines and surely, precarious evidence upon which to base a conviction." *Id.* at 474-75.

16

The Court held that such attenuated evidence was insufficient to support a conviction. *Id.*

¶38.    More relevant to the case at hand, which concerns the alleged speculative nature of Luckett's testimony about Davis's comment, are the facts and holding in *Boyd v. State*, 383 So. 3d 1280 (Miss. Ct. App. 2024).  There, Boyd was charged with capital murder for killing Desmond Davis during a robbery.  *Id*. at 1282 (¶1).  Two others had participated in the robbery: Goodin and White.  *Id*. at 1283 (¶7).  At trial, Goodin testified that earlier in the day, Boyd brought up robbing Davis, and the three went to the motel where Davis was staying. *Id*. at (¶8).  Goodin testified that Boyd said, "You need to get Dez (Davis) so we can 'hit this lick,'" which Goodin said meant "to rob him."  *Id*. at (¶9).  On the way to Davis's room, they met Hickman, a friend of Boyd's, and asked Boyd what he was "fixing" to do.  *Id.* at 1284 (¶19).  Boyd replied, "I'm fixing to go 'hit a lick.'"  When they got to Davis's room, a fight ensued, and Boyd eventually shot Davis.  *Id*. at 1283 (¶¶11-12).  After being convicted of capital murder, Boyd appealed and argued, among other things, that "the record is undisputed that [he] never said to anyone that he intended to rob Davis, but rather the State relied solely on Goodin's and Hickman's interpretation of the phrase 'hit a lick.'"  *Id*. at 1287 (¶35).  We held that, "[i]n light of Goodin's testimony about what he and Boyd had discussed before running into Hickman at the Western Motel, and viewing the evidence in the State's favor, we find that a juror could also reasonably infer that Boyd meant he was going to rob Davis when he told Hickman he was 'fixing to go hit a lick.'"  *Id*. at 1288 (¶38).

¶39.    Here, Luckett's "understanding" of Davis's statement that he had a "motion in an old car" was not speculation.  Rather, Luckett was explaining the meaning of the statement,

17

apparently as understood among criminals, that Davis had identified a target to be robbed, namely, Benford, who was in an old blue car. Luckett explained to the jury and to Investigator McDougle who confirmed Luckett's pre-trial statement, what Davis meant, stating:

Q. So you were aware there's a plan to rob --

A. Yes, sir.

Q. -- somebody in an old school blue car?

A. Yes, sir.

According to Luckett, Davis planned to rob Benford. Micah testified that Davis and Benford had hung out before, and Davis knew Benford dealt drugs and had money. Micah also testified that Benford had $3,000 to $4,000 cash on him less than an hour before the shooting, making Benford a likely target for a robbery. The proof also showed that the cash was not there after the shooting. Just as in *Boyd*, a reasonable jury in this case could infer that Davis had planned to rob Benford when he told Luckett that he had a "motion on a blue car."

¶40. Davis also argues that there was no proof presented that anything owned by Benford was taken by Davis or his accomplices. He points out that there was no testimony that Davis or the others demanded money or anything from the deceased. Davis posits an alternative reasonable explanation for the missing money, namely, that he left Micah earlier, and Benford went somewhere and spent the money to purchase the drugs and guns. Thus, Davis contends, there was insufficient proof that the money was taken during the assault on

18

Benford or that the killing took place during a robbery. The State counters that when Luckett was leaving the scene, he looked back and saw that someone had opened the passenger side door, inferring that Davis or Meyers had taken the money before they left or attempted to do so.

¶41. Here, Micah testified that Davis and Benford had hung out together. Because Benford was known as a drug dealer, it could be inferred that Davis would know that Benford was likely to have drugs or money on him. Luckett, who told the jury that he pled guilty to armed robbery, testified that he heard Davis on the phone telling LeFlore that he (Davis) had identified Benford as a target for robbery. This direct evidence supports a finding that Davis planned to rob Benford. Further, Luckett testified that after the shooting, the driver of Davis's gray Toyota pickup specifically called to "Von, *Prada*, and BD" to get in the truck, and Davis told law enforcement that Prada was his nickname. This testimony placed Davis at the scene. Davis was later arrested and admitted that the gray pickup was his.

¶42. Moreover, proof that Davis or Meyers actually took the money is not a necessary element of robbery. As previously stated, in section 97-3-79's definition of armed robbery, both *an attempt* to take as well as an actual taking of another's property constitute robbery. *Clark*, 343 So. 3d at 999 (¶270) (citing *Harris v. State*, 445 So. 2d 1369, 1370 (Miss. 1984)). For example, in *Broomfield v. State*, 878 So. 2d 207, 210 (¶2) (Miss. Ct. App. 2004), we affirmed the convictions of Broomfield and co-defendant Flewellen of armed robbery when they broke into a motel room and assaulted two women but left without taking anything. This Court noted:

19

Mississippi Code Annotated Section 97-3-79 (Rev. 2000) provides that a person may be convicted of armed robbery if an attempt is made. Mississippi Code Annotated Section 97-1-7 (Rev. 2000) contemplates a crime for attempt to commit any offense if the person makes any overt act toward the commission of the crime, but for whatever reason he fails to complete the necessary acts.

*Id*. at 212 (¶13); *see also Thomas v. State*, 277 So. 3d 532, 536 (¶15) (Miss. 2019) (finding evidence sufficient to establish an attempted armed robbery when police arrived at the store Thomas was robbing, causing him to flee without taking anything). Here, the jury was instructed, with no objection from Davis, on the elements of robbery, tracking the language of the statute and requiring proof of taking *or attempting* to take something from the victim.[6] It was undisputed that Benford had money on his person at 7:50 p.m. when Micah left him, but it was not there when Benford was found dead shortly thereafter. Alternatively, Davis could have been after any drugs that might have been in the car but left before anything could be taken.

¶43. Whether Benford spent the money to purchase drugs or whether Davis took or attempted to take the money or the drugs was a question for the jury to decide. "The jury, after being properly instructed on the law, acts as the finder of fact having the duty to resolve

---

[6] The court gave Jury Instruction S-2, which read:

The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt that the Defendant, Darquise James Davis, on or about April 1, 2022, in Scott County, Mississippi, did willfully, unlawfully, and feloniously take or attempt to take from the presence of Christe'ian Deshun Benford, by putting the said Christe'ian Deshun Benford, in fear of immediate injury to his person by the exhibition of a deadly weapon, namely, a firearm, the personal property of Christe'ian Deshun Benford, namely cash money, then that would constitute a robbery as referenced in these instructions.

conflicting evidence to determine what the jury finds to be more believable." *Carter v. State*, 385 So. 3d 488, 495 (¶20) (Miss. Ct. App. 2024). "Once the duty to resolve conflicts in the proof is accomplished, the jury's determinations are entitled to deference when challenged at the trial level or on appeal." *Id*. A reasonable inference from the proof presented was that Davis and Meyers took or attempted to take the money they thought Benford had. Viewing the evidence and inferences therefrom in the light most favorable to the State, we find the proof was sufficient to convict Davis of capital murder by killing Benford during a robbery.

## II.    Whether the verdict is against the overwhelming weight of the evidence.

¶44.    Davis also argues that the verdict is against the overwhelming weight of the evidence, raising the same arguments he raised concerning the sufficiency of the evidence. He contends that the State failed to show that the killing occurred during a robbery, that no money or other property of Benford's was found on Davis, and that Benford may have used the money to purchase the drugs and guns that were found at the scene by law enforcement.

¶45.    The State reiterates its arguments that the money was there when Micah was with Benford and gone thirty minutes later when Benford was found dead. The State adds that just days before the shooting, Benford had accused Davis of taking his cousin's gun and demanding that he return it. This, the State says, gave Davis a motive to rob and harm Benford. Moreover, the State points out, the jury heard law enforcement's testimony of how Davis initially lied about having a nickname or being in Morton that day. When confronted, Davis later admitted that he was in Morton, that he was known as Prada, and that he owned the 9mm handgun found in gray pickup truck he admitted was his. In addition, Hathcock

21

definitively testified that the 9mm casing found at the scene came from Davis's handgun.

¶46.   We recently reiterated:

> It is well established that the jury determines matters of weight, credibility, and conflicting evidence. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury.

*Simmons*, 387 So. 3d at 1047 (¶45) (citations and quotation marks omitted).  Accordingly, having reviewed the record, we cannot say that the jury's verdict was so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice.

## Conclusion

¶47.   Because the State presented sufficient proof on the elements needed to establish Davis's guilt of capital murder, and because the jury's verdict was not so contrary to the weight of that evidence so that affirming would sanction an unconscionable injustice, we affirm Davis's conviction and sentence.

¶48.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, CONCUR.**